IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

HEATHER ROTH,

    Plaintiff,

v.

KAISER FOUNDATION HEALTH PLAN OF COLORADO, and DR. PAMELA MCGROGAN, individually

    Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiff Heather Roth, by and through undersigned counsel, files this Complaint against Kaiser Foundation Health Plan of Colorado (herein "Kaiser") and Dr. Pamela McGrogan.

### I.    JURISDICTION AND VENUE

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2617(a)(2), because this action arises under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, and related state law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant Kaiser Foundation Health Plan of Colorado is authorized to do business and does business in the District of Colorado, Defendant Dr. Pamela McGrogan is a resident of the State of Colorado, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## II. PARTIES

3. Heather Roth is a resident of and domiciled in the State of Colorado.

4. Defendant Kaiser is a Colorado nonprofit corporation that is authorized to do business in Colorado, with a principal office location at 10350 E Dakota Ave., Denver, CO 80247.

5. Defendant Kaiser may be served through its registered agent, Corporation Service Company, at 1900 W Littleton Blvd., Littleton, CO 80120.

6. Defendant Dr. Pamela McGrogan is a resident of the State of Colorado and, at all relevant times, was employed by or affiliated with Kaiser and served as Associate Medical Director for Urgent Care at Kaiser's Lone Tree facility. Dr. McGrogan acted within the State of Colorado and is subject to the personal jurisdiction of this Court.

## II.   FACTUAL ALLEGATIONS

6. Plaintiff Heather Roth began working for Kaiser in March 2016 as a Physician Assistant ("PA").

7. Ms. Roth worked at Kaiser's Lone Tree Urgent Care Department located at 10240 Park Meadows Dr., Lone Tree, CO 80124.

8. Throughout her employment, Ms. Roth was an exemplary employee who received positive performance reviews and was in good standing.

9. As a PA, Ms. Roth had to be overseen by a supervising physician under a Supervisory Agreement.

10. In 2016, Kaiser assigned Dr. Groce as Ms. Roth's supervising physician until Dr. Groce transferred clinics three years later.

11. In 2019, Kaiser assigned Dr. Suzanne Hutchison as Ms. Roth's new supervising physician.

12. Ms. Roth worked successfully under and had a positive relationship with Dr. Hutchison for five years.

13. In 2021, Ms. Roth experienced medical complications from Covid-19.

14. In or around 2022, Ms. Roth was diagnosed with an immunodeficiency disorder, which was exacerbated by her previous exposure to Covid-19. Ms. Roth's immunodeficiency disorder made her vulnerable to repeated, severe bouts of illnesses.

15. At all relevant times, Kaiser provided and tracked paid sick leave for Colorado employees pursuant to Colorado law, including the Colorado Healthy Families and Workplaces Act ("HFWA"). Ms. Roth used paid sick leave for illness, medical treatment, and COVID-19-related absences during 2022 and 2023.

16. Additionally, Ms. Roth was approved for intermittent leave under the Family and Medical Leave Act ("FMLA") from April 26, 2022, through April 3, 2023.

17. Ms. Roth's approved intermittent FMLA leave allowed her to take five days of FMLA leave per month.

18. Ms. Roth renewed her intermittent FMLA leave from March 14, 2023, through March 13, 2024, at the same frequency.

19. On or about October 24, 2023, Ms. Roth became ill with Covid-19. She quarantined at home for five days per Kaiser's policies.

20. After her quarantine, Ms. Roth traveled for three weeks of previously scheduled vacation and a continuing medical education conference. She returned to work on or about November 22, 2023.

21. When Ms. Roth returned at approximately 8 a.m. on November 22, 2023, she learned that Dr. Hutchison withdrew her agreement to be Ms. Roth's supervising physician.

22. Ms. Roth was stunned because Dr. Hutchison had never previously expressed any concerns about her performance.

23. Ms. Roth reached out to Dr. Hutchison to see if they could fix any problem that had arisen, but Dr. Hutchison was unwilling to speak with Ms. Roth.

24. Dr. Hutchison outlined the reasons she withdrew her agreement to supervise Ms. Roth in her annual review, which Dr. Hutchison signed on November 22, 2023, at 10:48 a.m.

25. The reasons given were:

    a. Ms. Roth had not yet provided all the medical record numbers ("MRNs") for her annual review.

    b. Ms. Roth had not yet completed the annual compliance training.

    c. An incident from July 2023 in which Ms. Roth and a nurse were allegedly arguing.

    d. Dr. Hutchison could not reach Ms. Roth while she was out of the office between October 25 and November 22, 2023.

    e. Dr. Hutchison allegedly had "multiple physicians approach [her] about [Ms. Roth's] management."

26. These reasons provided by Dr. Hutchison were pretextual because:

a. Ms. Roth was not required to provide the MRNs until her review was due in December 2023. Ms. Roth could not access Kaiser's medical records while she was out of the office between October 25 and November 22, 2023, because Kaiser had denied Ms. Roth's request for remote access.

b. Ms. Roth completed the annual compliance training while she was out of the office and before she returned to work on November 22, 2023. Ms. Roth obtained a certificate of completion two weeks before Dr. Hutchison withdrew as her supervising physician.

c. Kaiser previously investigated the incident in which Ms. Roth and a nurse were allegedly arguing. Kaiser did not discipline anyone involved. And the nurse involved had a history of multiple verbal altercations with various staff members.

d. Dr. Hutchison had Ms. Roth's personal contact information, which she had used to reach Ms. Roth in the past. Dr. Hutchison did not attempt to reach Ms. Roth between October 25 and November 22, 2023.

27. At the time, no details were provided about the alleged concerns regarding Ms. Roth's "management," which prevented Ms. Roth from responding to these alleged concerns in a timely manner.

28. ." Ms. Roth understood the comment about management to be referring to her FMLA absences.

29. Later, during the EEOC process in July 2024, Kaiser tried to justify the alleged concerns about "management" by providing details.

5

30. Before November 22, 2023, Ms. Roth consistently received positive feedback and annual performance reviews from Dr. Hutchison.

31. Kaiser placed Ms. Roth on administrative leave on November 22, 2023, and gave her 30 days to find a new supervising physician, stating that it would terminate Ms. Roth if she did not find a new supervising physician during that time.

32. Kaiser placed the onus to find a supervising physician on Ms. Roth in contravention of its own policies and in a deviation from how it treated other PAs.

33. When Ms. Roth began her employment with Kaiser in 2016, Kaiser affirmatively assigned her a supervising physician, Dr. Groce. Kaiser later assigned Ms. Roth a different supervising physician, Dr. Hutchison. At no time during these prior transitions was Ms. Roth required to secure her own supervising physician independently.

34. Typically, PAs were not required to find a supervising physician on their own. Kaiser's Physician Assistant Practice Agreement stated, "a PA, *with the assistance of* the Clinical Practice Manager and Department or Medical Office Chief shall use best efforts to identify a new PSP."

35. Ms. Roth contacted every potential supervising physician, only to find her efforts were being sabotaged by Defendant Dr. McGrogan.

36. Defendant Dr. McGrogan was directly involved in communications concerning Ms. Roth's supervising physician status, received contemporaneous explanations from Dr. Hutchison regarding the withdrawal of supervision, and participated in decisions affecting whether proposed supervising physicians would be approved or rejected.

37. For example, Dr. Groshek had agreed to supervise Ms. Roth, but suddenly withdrew his offer after Dr. McGrogan contacted him when she learned that Dr. Groshek had agreed to supervise Ms. Roth.

38. Then, Dr. Blieden agreed to supervise Ms. Roth. But Kaiser refused this arrangement because Dr. Blieden was a 0.5 full-time employee ("FTE").

39. During the grievance and arbitration proceedings that followed Ms. Roth's termination, Kaiser was unable to identify or produce any written policy, collective bargaining agreement provision, or Physician Assistant Practice Agreement prohibiting a physician working 0.5 FTE from serving as a supervising physician.

40. Testimony during the grievance and arbitration proceedings further established that Kaiser permits and anticipates circumstances in which a PA may have more than one supervising physician, including the use of secondary supervising physicians when physician specialty, patient population, or scheduling so requires.

41. After Ms. Roth requested assistance, Kaiser provided her with a list of five purportedly available supervising physicians. The list included a physician who had already withdrawn supervision, a physician who was on leave and not working at the time, a physician whom Ms. Roth had recently reported for an ethics violation, and physicians who were already saturated and unavailable to supervise additional PAs. Kaiser refused to provide additional names despite Ms. Roth's repeated requests.

42. Kaiser's actions to prevent Ms. Roth from securing a supervising physician did not align with SB 23-083, codified at C.R.S. §§ 12-240-107 and -114.5, as amended.

43. On December 22, 2023, Kaiser terminated Ms. Roth, allegedly for failing to secure a new supervising physician within the 30-day timeframe.

44. During her administrative leave, several colleagues contacted Ms. Roth and explained they believed Kaiser put her on leave because of her FMLA absences.

45. Dr. Clune also told Ms. Roth that Dr. McGrogan had told Dr. Clune that the reason Ms. Roth no longer had a supervising physician was that she had 55 absences that year.

46. This was unsurprising as Dr. McGrogan had previously made negative comments about Ms. Roth's absences, claiming Ms. Roth left her colleagues "in the lurch" when she took intermittent FMLA leave.

47. Although Ms. Roth took paid sick leave for absences due to illness, COVID-19 infection, quarantine, and medical treatment—each protected under law—Kaiser's and Dr. McGrogan's claim that she had '55 absences' was false and contradicted by Kaiser's own attendance records, which show that Ms. Roth remained within her available protected leave at all relevant times.

48. Kaiser's staffing practices prioritized employee attendance over safety.

49. Evidence presented during the grievance and arbitration proceedings established that staffing shortages in Kaiser's urgent care clinics made Ms. Roth's approved intermittent FMLA absences a source of frustration for management and that her absences were discussed as a problem affecting clinic staffing prior to the withdrawal of her supervising physician.

50. At the time of her termination, Ms. Roth still had approximately 80 hours of accrued paid sick leave available to her under Colorado law, as well as available intermittent FMLA

leave. Kaiser nonetheless treated her use of protected sick leave as a basis for adverse employment action, in violation of HFWA.

51. Ms. Roth filed a Union Grievance requesting reinstatement, which was denied on or about February 6, 2024.

## FIRST CLAIM FOR RELIEF
### Retaliation in Violation of the Family and Medical Leave Act, 29 U.S.C. § 2615
### (Against Defendant Kaiser Only)

52. Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

53. It is unlawful for an employer to retaliate against an employee for exercising their right to FMLA leave. 29 U.S.C. § 2615(a)(2).

54. Defendant Kaiser is a covered employer within the meaning of the FMLA.

55. At all relevant times, Plaintiff was an eligible employee within the meaning of the FMLA.

56. Plaintiff's immunodeficiency disorder constitutes a serious health condition under the FMLA.

57. Plaintiff engaged in protected activity under the FMLA when she took approved intermittent FMLA leave for her own serious health condition between April 2022 and her termination in December 2023.

58. Plaintiff suffered adverse employment actions when Dr. Hutchison withdrew her agreement to be Plaintiff's supervising physician, Defendant Kaiser put Plaintiff on administrative leave, and when Defendant Kaiser terminated Plaintiff.

59. Dr. Hutchison's cited reasons for withdrawing her agreement to be Plaintiff's supervising physician were largely related to Plaintiff's exercise of her FMLA rights.

60. Defendant Kaiser, through, in part, Defendant Dr. McGrogan, expressed displeasure with Plaintiff's exercise of her FMLA rights.

61. There is a causal connection between Defendant Kaiser's adverse actions against Plaintiff and Plaintiff's FMLA protected activity.

62. Plaintiff's FMLA protected activity was a motivating factor in Defendant Kaiser's decision to terminate her.

63. Defendant Kaiser's actions were likely to discourage a reasonable worker in Plaintiff's position from exercising their FMLA rights.

64. Defendant Kaiser's alleged reasons for its adverse actions against Plaintiff were pretextual.

65. Defendant Kaiser did not act in good faith when it retaliated against Plaintiff for exercising her FMLA rights and had no reasonable grounds to believe its actions were in accordance with the FMLA.

66. As a direct and proximate result of Defendant Kaiser's FMLA retaliation, Plaintiff has suffered economic losses, including, but not limited to, lost wages and benefits.

## SECOND CLAIM FOR RELIEF
### Interference in Violation of the Family and Medical Leave Act, 29 U.S.C. § 2615
### (Against Defendant Kaiser Only)

67. Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth.

68. It is unlawful for an employer to interfere with an employee's exercise of their right to FMLA leave. 29 U.S.C. § 2615(a)(1).

69. Defendant Kaiser is a covered employer within the meaning of the FMLA.

70. At all relevant times, Plaintiff was an eligible employee within the meaning of the FMLA.

71. Plaintiff's immunodeficiency disorder constitutes a serious health condition under the FMLA.

72. Plaintiff was entitled to take intermittent FMLA leave for her own serious health condition from April 2022 until at least March 2024.

73. Plaintiff suffered adverse employment actions when Dr. Hutchison withdrew her agreement to be Plaintiff's supervising physician, Defendant Kaiser put Plaintiff on administrative leave, and when Defendant Kaiser terminated Plaintiff.

74. Defendant Kaiser interfered with Plaintiff's right to take FMLA leave when it took the abovementioned adverse actions and ultimately terminated Plaintiff in December 2023.

75. Defendant Kaiser's adverse actions against Plaintiff were related to Plaintiff's exercise of her FMLA rights.

76. Defendant Kaiser took the abovementioned adverse actions against Plaintiff during her approved period of intermittent FMLA leave.

77. Defendant Kaiser's alleged reasons for its adverse actions against Plaintiff were pretextual.

78. Defendant Kaiser did not act in good faith when it interfered with Plaintiff's FMLA rights and had no reasonable grounds to believe its actions were in accordance with the FMLA.

79. As a direct and proximate result of Defendant Kaiser's FMLA interference, Plaintiff has suffered economic losses, including, but not limited to, lost wages and benefits.

**THIRD CLAIM FOR RELIEF**
**Tortious Interference with Contract**
*(Against Defendant Dr. Pamela McGrogan Only)*

80. Plaintiff hereby incorporates by reference all previous paragraphs as though fully set forth herein.

81. At all relevant times, Plaintiff had a valid and existing employment relationship and contractual expectancy arising from the Physician Assistant Practice Agreement governing the terms and conditions of her continued employment with Defendant Kaiser, including her continued employment as a Physician Assistant subject to a supervising physician arrangement.

82. Defendant Dr. McGrogan had actual knowledge of Plaintiff's employment relationship and contractual expectancy with Defendant Kaiser.

83. Defendant Dr. McGrogan intentionally and improperly interfered with Plaintiff's employment relationship and contractual expectancy by engaging in affirmative acts designed to prevent Plaintiff from maintaining or securing a supervising physician, which was a necessary condition of her continued employment.

84. Specifically, Dr. McGrogan:

   a. Contacted physicians who had agreed, or were willing, to serve as Plaintiff's supervising physician and caused them to withdraw or decline that agreement;

   b. Intervened after learning that Dr. Groshek had agreed to supervise Plaintiff, resulting in the sudden withdrawal of that agreement;

    c.    Participated in or ratified the rejection of Dr. Blieden as a supervising physician based on a purported policy that Defendant Kaiser has refused to produce and which, upon information and belief, did not exist or was not consistently applied;

    d.    Communicated to other physicians that Plaintiff no longer had a supervising physician due to the number of absences she had taken while on approved FMLA leave.

85. Defendant Dr. McGrogan's actions were undertaken with improper motive and improper means, including retaliation for Plaintiff's exercise of her rights under the Family and Medical Leave Act and personal animus toward Plaintiff for taking protected medical leave.

86. Defendant Dr. McGrogan acted outside the scope of any legitimate business justification and outside the privilege afforded to managerial employees by intentionally sabotaging Plaintiff's efforts to comply with employment requirements that Defendant Kaiser ordinarily assisted Physician Assistants in satisfying.

87. Defendant Dr. McGrogan's interference was not justified by any legitimate staffing, credentialing, or patient-care concern and deviated from Defendant Kaiser's ordinary practices and policies regarding supervising physician arrangements.

88. As a direct and proximate result of Defendant Dr. McGrogan's intentional interference, Plaintiff was unable to secure a supervising physician, was placed on administrative leave, and was ultimately terminated from her employment on December 22, 2023.

89. Plaintiff suffered damages as a direct and proximate result of Defendant Dr. McGrogan's conduct, including lost wages and benefits, loss of future earning capacity, emotional distress, and other non-economic damages.

90. Defendant Dr. McGrogan's conduct was willful and wanton and carried out with conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of exemplary damages pursuant to C.R.S. § 13-21-102.

### FOURTH CLAIM FOR RELIEF
**Interference and Retaliation in Violation of the Colorado Healthy Families and Workplaces Act ("HFWA")** C.R.S. § 8-13.3-401, *et seq.*
*(Against Defendant Kaiser Only)*

91. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

92. At all relevant times, Defendant Kaiser was an employer covered by HFWA.

93. At all relevant times, Plaintiff Heather Roth was an employee entitled to the protections of HFWA.

94. HFWA entitles employees to use paid sick leave for, among other things, physical illness, medical treatment, and absences related to communicable disease, including COVID-19.

95. During her employment, Plaintiff used and attempted to use paid sick leave for illness, medical treatment, and COVID-19–related absences protected under HFWA.

96. Defendant Kaiser was aware that Plaintiff's absences included paid sick leave protected by Colorado law.

97. Defendant Kaiser interfered with Plaintiff's exercise of her HFWA rights by subjecting her to adverse employment actions because of her use of paid sick leave, including but not limited to undermining her ability to maintain a supervising physician, placing her on administrative leave, and terminating her.

98. Defendant Kaiser retaliated against Plaintiff for using and attempting to use paid sick leave by interfering with the assignment of a supervising physician, expressing hostility toward her absences, and ultimately terminating her employment.

99. Statements by management, including but not limited to Defendant Dr. McGrogan, regarding Plaintiff's number of absences, staffing frustrations related to her leave usage, and the timing of adverse actions following protected leave demonstrate a causal connection between Plaintiff's use of HFWA-protected leave and Defendant Kaiser's actions.

100. Defendant Kaiser's actions were likely to deter a reasonable employee from exercising rights protected by HFWA.

101. Defendant Kaiser's stated reasons for its actions were pretextual and not the true reasons for Plaintiff's termination.

102. As a direct and proximate result of Defendant Kaiser's violations of HFWA, Plaintiff suffered economic damages, including lost wages and benefits.

103. Plaintiff is entitled to all relief available under HFWA, including back pay, reinstatement or front pay, statutory penalties, actual damages, attorneys' fees, and costs.

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that this Honorable Court enter a judgment for the Plaintiff as follows:

    a. An award of actual damages in amount to be determined at trial, including, but not limited to, lost wages and benefits;

    b. An award of consequential economic damages, including but not limited to loss of future earning capacity and out-of-pocket losses;

    c. An award of liquidated damages;

d. Non-economic damages in an amount to be determined at trial, including but not limited to, emotional distress, mental anguish, anxiety, humiliation, and embarrassment, and loss of enjoyment of life;

e. An award of damages for injury to Plaintiff's professional reputation and impairment of future employment opportunities;

f. Exemplary damages;

g. Statutory penalties as authorized by C.R.S. § 8-13.3-408;

h. An award of reasonable attorneys' fees and costs;

i. A tax penalty offset;

j. An award of Plaintiff's pre- and post-judgment interest; and

k. Ordering such and further equitable and legal relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted December 22, 2025.

/s/ *Rachel E. Ellis*
Rachel E. Ellis
Kit E. Longnecker
Livelihood Law, LLC
12015 E. 46th Avenue, Suite 240
Denver, CO 80239
Phone: (720) 465-6972
Email: ree@livelihoodlaw.com
       kel@livelihoodlaw.com